MADISON COUNTY SAVINGS BANK, Appellee, v. ROBERT E. PHILLIPS et al., Appellants.

No. 42207.

OCTOBER 24, 1933.

Shirley A. Webster, for appellants.

Charles D. Van Werden and Percival & Wilkinson, for appellee.

EVANS, J.—For many years preceding the events involved herein, the defendant Robert Phillips was a prosperous farmer living upon his farm in Madison county. His farm consisted of 340 acres in a body and of a separate tract in another township comprising 83 acres. His farm carried a long-term mortgage of $16,000. The events involved herein cover a period of time from January, 1917, to April 9, 1932. In January, 1917, the son, Edwin, was married. He was then twenty-four years of age. He had lived with his father up to that time, and had worked for him upon the farm without any agreed compensation. It was thereupon agreed between father and son that the father would give to the son one-fourth of all the stock upon the farm, and that the son would undertake to operate the farm jointly with the father for one-fourth. the net proceeds thereof. In addition to such stock, the son was to have as his own all the poultry and eggs and all the cream. The son so operated the farm for the year 1917 and until December, when he was called into the World War. He returned from the World War in February, 1919. The suspended contract between father and son was at once resumed, and the son immediately took charge of the farm operation. The father moved out and the son moved in and has operated the farm continuously ever since. The claims, which the son asserts against his father and which were recognized and secured in the transfers under attack, arose out of this contract. The charge of fraud is predicated upon the claim that the consideration for the transfers is a pretense and not a reality, and that the transfers were executed by the father and received by the son only for the purpose of defrauding the creditors of the father. The father was a stockholder and director in the Peru Bank, which closed its doors in July, 1930. Prior to its closing, an arrangement had been entered into by the directors of the bank with three banks at Winterset to take over the assets of the Peru Bank and to assume payment of the deposits. The defendant Robert and other directors executed to the Winterset Banks their obligation in the nature of a guaranty to the amount of $58,000. This amount was far in excess of the

value of all the property of Robert. This contract was entered into July 15, 1930. For the purposes of a creditor's bill, Robert must be deemed insolvent from that date. We turn back to the farm operations between father and son.

In February, 1921, father and son had a settlement over the operation of the farm for the years 1919 and 1920. According to the testimony for the defendants, it was found that the father was owing the son $3,080. He executed his note therefor payable in one year. No further settlement was ever had between them until 1930 and 1931. The son carried the note until February, 1930. In February of that year the note was taken up by the father and a new note executed for $3,500. The increased amount of the second note was intended as an allowance of interest. On December 26, 1931, the father and son had a settlement covering the years 1921 to 1931, inclusive, and found the amount due the son to be $7,900, for which a note was executed. On the same day the son bought from the father 100 acres out of the 340-acre tract at an agreed price of $8,500. In payment therefor he canceled the $3,500 note and assumed payment of $5,000 of the existing mortgage, which rested upon the whole farm. At the same time he took a chattel mortgage upon his father's interest in all the personal property upon the farm as security for the payment of the $7,900. For the same purpose he took a warranty deed of the 83-acre tract. He also signed a declaration of trust to the effect that he held the deed only as security for the payment of the $7,900. These instruments were all recorded except the declaration of trust. On April 9, 1932, he paid an additional sum of $517 in taking up one of his father's obligations at the bank. On the same date he took an additional mortgage from his father covering the 240 acres still owned by the father, though subject to a first mortgage. The net result of these transactions was that the son held a lien upon all his father's property, subject only to the existing first mortgage of $16,000. The question before us is to determine whether the son was within his rights in obtaining a preference over other creditors or whether he was guilty of pretense and fraud. The controversy naturally resolves itself into two parts. The first part relates to the $3,500 note; the second part to the $7,900 note. The pivotal point in the case is the consideration. Was it bona fide?

On the trial of the case, the defendant Edwin purported to present a complete accounting of all the proceeds received from

the farm and of all the expenses paid therefrom for the entire period from February, 1919, to December, 1931. He testified that he had kept an accurate account of all items for all the years. He produced two books, which had been kept by him. These appear in the record as Exhibits 1 and 2. Exhibit 1 carried the account to the close of 1925, and Exhibit 2 carried the account from the beginning of 1926 to the end of 1931. Objection is urged to the admissibility of the exhibits. We think they are clearly admissible for the purpose for which they were used. They were not used or offered independently of the oral testimony of Edwin. He testified that he had made every entry therein and that with the aid of the books he was able to remember the events therein referred to. These items show a total of receipts from the farm for the eleven years in excess of $74,000 and of expenses of more than $19,000. They also show the amount received by him on his share to be about $5,400. Poultry and eggs and cream are not included in these items. These belonged exclusively to Edwin. As indicating the form of this account, we set forth the account for 1923 as follows:

"1923
Sold

| | |
|---|---:|
| A load of hogs | $1462.36 |
| Tim. seed Dodd | 2.30 |
| Tim. seed Boler | 6.86 |
| Oats to Porter | 47.20 |
| Oats to Williams | 22.80 |
| Tim. seed to Callder | 3.00 |
| Tim. seed to Murphy | 14.00 |
| Tim. seed to Ives | 5.00 |
| Oats Russell Phillips | 34.80 |
| Oats J. W. Fulton | 22.65 |
| Oats Fred Glass | 21.45 |
| Corn Nuzum | 25.40 |
| Oats Cox roadman | 23.85 |
| Oats Mr. Middleton | 2.65 |
| Oats P. F. Beeler | 80.35 |
| Oats Cox roadman | 21.25 |
| Oats Earl Holma | 2.95 |
| Corn Frank Michner | 20.40 |
| Corn Walt Bradshaw | 128.00 |
| Cattle to Earlham man | 2994.42 |

| | |
|---|---|
| Insurance money for dairy | 125.00 |
| Corn to J. B. Hal | 20.00 |
| Corn Will Davis | 152.00 |
| A load of hogs | 1481.32 |
| Corn to L. R. Youman | 21.25 |
| Corn to Ben Bradshaw | 21.75 |
| Corn to Nezum | 24.45 |
| Corn to Frank Roby | 121.60 |
| Corn to Norman Bowler | 247.50 |
| Corn to Will Davis | 62.30 |
| Corn to Fletcher Porter | |
| Oats & Corn to Elmer | 116.50 |
| Corn to J. W. Fulton | 98.50 |
| Corn to Bert Roby | 63.15 |
| Corn to Lyle Shutt | 3.15 |
| Oats Henry Frank | 9.80 |
| Corn to Mrs. Chapman | 25.00 |

### "1923
### Bought

| | |
|---|---|
| Hogs at O'Leary sale | $ 110.25 |
| Pump cylinder 7 ford | 5.75 |
| Oil meal & Shorts | 10.60 |
| Salt twine 7 salvet | 20.00 |
| Wagon box | 5.50 |
| Clover seed from Sam Morgan | 49.60 |
| Ike Vandermey | 20.00 |
| New Scoop and spreader repair | 2.55 |
| Nails & repair on pump | .65 |
| Corn husking | 73.80 |
| Freight on stock food | 1.30 |
| Salt and shorts | .5.00 |
| Engine repair | 1.25 |
| Engine batteries | 2.00 |
| Well cleaning bucket | .85 |
| Nails & staples | 1.70 |
| Threshing | 53.00 |
| Casting for disc | 1.50 |
| Lumber for feed bunk and nails | 2.58 |
| Horse feed & dinner hotel | 7.85 |
| Harness & repair | 20.95 |

| | |
|---|---:|
| File & soldering gas engine tank | .70 |
| Clover seed of Boler | 19.65 |
| Tankage | 33.50 |
| Plow shares | 7.84 |
| Wire & staples | 1.00 |
| Harness repair | .85 |
| Clare Guthrie | 3.00 |
| Binding twine & electric weld-rake | 4.15 |
| Sharpening plow share | .75 |
| Trucking hogs | 22.00 |
| Team & loader at Patterson sale | 173.00 |
| Calves of Elmer | 52.00 |
| Hail insurance | 99.00 |
| Tankage | 15.25 |
| Mattex & harness repair | .80 |

## "1923
### Credit to father, R. E. Phillips

| | |
|---|---:|
| Sugar | $ 8.10 |
| Gas | 7.64 |
| Gas | 9.28 |
| Gas | 8.44 |
| Car wheel for cash | 2.50 |
| Gas | 6.08 |
| Money for preacher | 12.50 |
| Gas and oil | 20.39 |
| Switch fees | 2.25 |
| Gas | 7.94 |
| His share in Beller & Dudney corn | 142.46 |
| Gas | 6.53 |
| Corn | 3.00 |
| Piano | 300.00 |
| Incubator & traps at Patterson sale | 11.00 |
| Gas | 6.32 |
| Gas | 3.63 |
| Insurance on piano | 6.70 |
| Clothing at Murray | 41.25 |
| Gas | 6.25 |
| Front spring | 2.50 |
| His share in dragging | 48.75 |

One bunch of shingles........................................................ 1.60
5 gal. gas.................................................................... .85"

The three parts of the foregoing appear on separate pages.

We inquire first into the genuineness of the note of $3,080 purporting to have been made in February, 1921. Both defendants testified to its genuineness. No one challenges the signature thereto. The defendants' Exhibit 1, as already indicated, includes the years 1919 and 1920. So far as appears, the note is consistent with the account as it appears in Exhibit 1. It is not claimed that there is any discrepancy between the note and the account. The appearance of the note indicates a considerable age. If genuine, the note of $3,500 is thereby explained. This was made in February, 1930. This date was before Robert had become insolvent by the signing of the bank guaranty. There was no known motive for fraud or deception in 1921 or in February, 1930. We are satisfied beyond a reasonable doubt, therefore, that in December, 1931, the father was owing the son the $3,500 note as a bona fide debt. The arrangement of December 26, 1931 so far as it involved the $3,500 note, was that the son should buy a specified 100 acres for $8,500, and that it should be paid for by the surrender of the note and by the assumption of $5,000 of the existing mortgage upon the whole tract of 340 acres. The witnesses for the plaintiff fix the value of the 100-acre tract at $70 per acre. The amount of consideration therefore represented the full value. The method of its payment was not prejudicial to other creditors. It reduced the liabilities of the common debtor without putting into his hands any money, which might be diverted by the debtor to other uses than the payment of his debts. For instance, if Edwin had paid $8,500 in money or in negotiable paper, it might be claimed that he was a mere volunteer and that his payment of the consideration simply enabled the debtor to put his property to that extent beyond the reach of his creditors. On the contrary, the later creditors got the full benefit of the consideration paid by Edwin, in that the liabilities of the debtor were reduced to the full amount of the consideration paid.

Unless, therefore, this part of the transaction became tainted with other fraud, the purchase of the 100 acres must be deemed a legitimate transaction.

II. We turn to the other transaction, which involves the good faith of the alleged $7,900 claim. The plaintiffs introduced evi-

dence that in a certain property statement made by Robert he made no reference to any debt due Edwin. It is shown also that Edwin never listed to the assessor any such claim. It is shown also that the partnership known among themselves as Robert Phillips & Son never made a federal income report, although their annual receipts exceeded $5,000. These circumstances have their significance, and they are entitled to consideration, but they are by no means controlling upon the question of fact. A broad latitude of inquiry is permissible in the discovery and proof of an alleged fraud. If the transaction herein considered is to be condemned, it must be on the ground that it is predicated upon a false consideration; and, if sustained, it must be on the ground that the consideration was genuine, and that the transfers amounted to a legitimate preference as between creditors. When a debtor extends a preference over other creditors, to his own kin, it naturally excites some repugnance to the moral sense as though it were necessarily a fraud. But the law sustains the right of preference as legitimate as any other legal right. The real question, which is determinative of the issue in this case is therefore that of the good faith of the consideration. If in truth the father was owing the son the $7,900, then the son has perpetrated no fraud upon other creditors. True, he must proceed with due regard to the rights of other creditors. He must not interpose unnecessary obstacles in the way of other creditors and in favor of the debtor. But, in so far as the acquisition of his own security necessarily operates *pro tanto* to the detriment of other creditors, he is under no bar.

The fact that the father and son did settle their accounts for the years 1919 and 1920 on the same basis that Edwin contends for now is a strong circumstance in support of this second branch of the case. Though $7,900 looks large at first sight, yet it covers a period of eleven years. It is only half as large in proportion as the amount due Edwin for the first two years under the then mutual agreement of the parties. The period of time covered by it is generally known as a period of comparative prosperity upon the farm. The evil days came in 1929 and thereafter. The misfortunes of the defendant Robert began in 1930. If Edwin was entitled to recover $3,080 as the balance of his one-fourth share for the first two years of their partnership, it would seem reasonable to say that he would become entitled to substantial sums in the subsequent years.

In resistance to Exhibits 1 and 2, it is urged that there is an absence of items for family living expenses. This objection overlooks the fact that Edwin had the exclusive ownership of poultry, eggs, and cream. The subject thus stressed in argument was not referred to in the introduction of the evidence. The evidence does show incidentally that Edwin kept 200 laying hens, and raised 300 young chickens every year. The quantity of cream sold does not appear. Whether they kept a garden does not appear. Moreover, the cash account was intended only to include the cash items in which both father and son were jointly interested. What is claimed by Edwin at this point is that he charged himself with all items drawn by him out of the partnership money for whatever purpose.

Stress was laid in argument upon the fact that a warranty deed was taken for the 83 acres, and that the same was recorded, whereas Edwin's acknowledgment that the deed was held only as security was withheld from the record. The action thus complained of worked no prejudice to the plaintiff; nor could it work any if the debt was *bona fide*. The testimony introduced by the plaintiff shows that the 83 acres was worth only $40 an acre. Some of the witnesses put it at a lesser sum. If Edwin had taken the 83 acres absolutely, in accordance with the terms of his deed, its value would not pay his claim. The taking of the deed, therefore, would operate only as a credit thereon. If the value of the land had been substantially greater than the debt, a somewhat different question would arise. To take a deed as security is not an unusual practice. It is as legitimate as any other form of security. If the method be resorted to for the purpose of deception, and if it be calculated to work deception in a particular case, it may be deemed evidence of an intended fraud. It is a circumstance to be considered like any other sinister circumstance. But the mere fact that the security was taken in the form of a deed is not a badge of fraud nor is it presumptively fraudulent. Assuming the debt of $7,900 to be genuine, there was nothing in the form of the security that invaded the right of this plaintiff as a creditor. The net result of the transaction of December 26, 1931, and of April 9, 1932, was to transfer to Edwin the absolute ownership of 100 acres of land at an agreed price of $8,500; and to give him a lien upon all the property of Robert, subject to the first mortgage as security for the payment of $7,900. Subject to such lien, the property is subject to process by other creditors.

The exhibits in the case are before us. We have given very critical consideration to Exhibits 1 and 2. Their physical appearance is strongly corroborative of the testimony of the defendants. We see no room to doubt their genuineness; or that they are what they purport to be. We are convinced that the entries and memoranda thereon were made from time to time in the course of the years. So far as they amount to a cash account, we discover nothing in their appearance to impeach them.

In view of the mutual conduct of father and son, concerning the interest of the son in the proceeds of the farm, at the earlier time when they had no motive to deceive and when the interest of no other creditor was involved, we think such past conduct throws its light upon the present. Edwin's claim now is consistent with his claim in 1921. His claim was acceded to then by the father; and it is acceded to by him now. He was then solvent; he is now insolvent. His insolvency naturally makes his creditors look askance. It naturally creates suspicion in the minds of interested parties; it commands the scrutiny of the court. But, whether solvent or insolvent, the rights of Edwin are the same and are the equivalent now of what they were in 1921. We think it must be said that the defendant Edwin presents a consistent account from the beginning of 1919 to the end of 1931; that the arrangement existing between them and the account arising therefrom was recognized and approved for the first two years by Robert while he was solvent and in the absence of all motive to falsify. Edwin's present claim is therefore not an afterthought, but is consistent with his former attitude and with the former attitude of his father. We reach the conclusion that the alleged indebtedness of $7,900 is *bona fide*.

The plaintiff's petition must therefore be dismissed, and the decree below accordingly reversed.

ALBERT, C. J., and CLAUSSEN, DONEGAN, and KINDIG, JJ., concur.